Argued May 1; affirmed as modified May 16, 1950

STEINER *v.* STEINER

218 P. (2d) 464

*Austin Dunn* argued the cause for appellant. On the briefs were Dunn & Jackson, of Baker.

*Harold Banta* argued the cause for respondent. On the brief were Hallock, Donald, Banta & Silven, of Baker.

Before Lusk, Chief Justice, and Brand, Belt, Rossman and Latourette, Justices.

LATOURETTE, J.

Plaintiff Emma Steiner appeals from that portion of a decree granting her a divorce, which awarded to the defendant husband "$6,000.00 in cash, such sum to be in full of all rights and interest of the Defendant in the community or other income, earnings or property of the parties during the existence of said marriage." Defendant cross appeals from the entire decree.

It is alleged in the complaint that:

"Plaintiff　*　*　* is not physically able to stand the constant quarreling that defendant began inflicting upon her shortly after their marriage and continued to inflict upon Plaintiff; that defendant, ever since the marriage of Plaintiff and defendant has constantly tried to obtain money from Plaintiff and has been successful to a certain degree; that defendant has often told Plaintiff that she is crazy and should be committed to an asylum and by his attitude has kept Plaintiff in constant fear of bodily harm, and Defendant has on numerous occasions cursed and sworn at Plaintiff calling her an 'old chippy' and other names too vile to mention, and that said course of cruel and inhuman treatment as hereinbefore particularly alleged and the acts therein complained of have continued to the time of the trial of this cause."

Defendant, in his answer and cross complaint, denied the allegations of cruel and inhuman treatment and set up two defenses:

"That the plaintiff has not legal capacity to sue in that the plaintiff now is and at all times since the filing of her original complaint herein has been mentally incompetent and incapable of conducting her own affairs. That a guardianship proceeding is now pending in this court on transfer from the County Court of Baker County seeking to have a guardian appointed for said incompetent. That this suit should accordingly abate until a guardian is appointed for the said incompetent or a guardian ad litem has been selected to act for her in this proceeding."

As a further and separate answer and defense by way of cross complaint, defendant alleges that he opposes any divorce on the grounds of plaintiff's unstable mental condition, but that if the court should find her to be mentally competent, plaintiff herself has

been guilty of cruel and inhuman treatment towards the defendant in the following respects:

"That the Plaintiff has almost continuously since a few months after the marriage of the parties quarreled at, berated and abused the defendant, frequently locking him out of their apartment, rifling and damaging his personal effects, and generally doing all in her power to harass and annoy the Defendant and make things miserable for him; that the Plaintiff has many times publicly and in the presence of other people accused the defendant wrongfully and without any cause or provocation whatever of trying to steal her money and various personal property. That all of said acts of cruel and inhuman treatment have been without the connivance or consent of the Defendant, have not been caused by any fault on his part, have rendered his life burdensome in the extreme and have made it difficult if not impossible for the parties to live and cohabit together in the marriage relationship."

He then asks for a separation from bed and board and asks for a third part of the whole of the real property owned by the plaintiff. He further states:

"That * * * defendant was induced to leave his home in California and come to Baker, Oregon, and marry the Plaintiff upon her representation and promise that she would turn over a large portion of her property to him, and that he would have a comfortable home with her in Baker throughout the remainder of his life. That acting upon said representations and promises the Defendant left his home in California where he was comfortably and permanently established and came to Baker at considerable financial loss and a good deal of further loss and inconvenience will be caused to the Defendant if he is now obliged to separate from the Plaintiff and establish himself in a home elsewhere. That such facts should be taken into

consideration in adjusting the property rights of the parties upon a permanent separation and provision should either be made for the establishment of a home for the defendant elsewhere or he should be granted full and proper right to live in a portion of the Weber apartments which should be set apart to him as his own free from any control on the part of the Plaintiff. That in addition thereto Defendant has acquired certain rights in the income to be derived from the property of the parties by virtue of the community property law and that an adjustment should be had of said community rights also in ordering such permanent separation."

Shortly after the divorce complaint was filed, defendant petitioned the court to have plaintiff declared incompetent, and upon stipulation of the parties, the divorce and incompetency cases were consolidated and heard by the trial court.

As hereinbefore indicated the court granted the plaintiff a decree of divorce but ordered plaintiff to pay the defendant the sum of $6,000.00.

The court further dismissed the incompetency proceedings from which there has been no appeal.

Plaintiff and defendant were married on the 26th day of September, 1947, in Winnemucca, Nevada, plaintiff at the time being of the age of 87 years and defendant being of the age of 72 years. Plaintiff's husband had theretofore died on the 11th day of October, 1944, leaving plaintiff property of considerable value. Defendant, sometime during the year of 1945 while residing in California and without being acquainted with plaintiff or her husband, began corresponding with plaintiff. He wrote a letter dated May 7, 1945, to the County Clerk of Baker county inquiring about the value of the deceased husband's estate and the heirs. Sometime during the summer of 1947, after

correspondence between the parties, he paid a visit to plaintiff in Baker, remaining from two to four days in that city. At that time marriage was discussed between them, and he returned to California. Correspondence ensued between the parties, whereupon he returned to Baker and they were married.

The evidence establishes and defendant admits that after the parties had a quarrel over some soap shortly after their marriage he broke into her apartment and carried away plaintiff's government bonds, aggregating some $30,000.00. He took the bonds to several banks in Portland, and upon their refusal to have anything to do with them, he sent them to the Federal Reserve Bank in San Francisco. Plaintiff thereupon sued him for divorce. He finally came back to Baker, whereupon the divorce suit was dismissed.

Things went from bad to worse up to September 8, 1948, approximately one year after the marriage, when plaintiff again sued defendant for divorce.

The evidence establishes and defendant admits that he took plaintiff's government bonds shortly after their marriage. It is further borne out by the evidence that plaintiff fell down in her apartment house and that defendant paid no attention to her on such occasion. His claim is that others looked after her. Plaintiff testified that defendant threw a bottle at her. This, defendant did not deny. It is further borne out by the evidence that defendant threatened plaintiff with his fists, which he did not deny. Plaintiff testified that defendant cursed her on occasions, with reference to which the following is found in the transcript:

"Q: Now, when he cursed you, just what did he call you?

"A. He would call me like I would be a chippy or a prostitute, something like that.

"Q. Words that would mean that. Did he call you a chippy?

"A. Yes, with those things, Mr. Dunn, that man's intention was that he would get me out of common sense.

"Q. You think that he kept—

"A. He know I was very sensitive woman.

"Q. He knew you were very sensitive and in your opinion he called you this—treated you this way—in order to get you out of your senses, is that right?

"A. To get me out of my own mind.

"Q. Did he keep this up and keep it up?

"A. He keep it up and keep it up always. There never was any peace. There never was anything that I could enjoy with that man."

In regard to this matter, the following questions were propounded by defendant's attorney and answered by the defendant:

"Q. Now, since—now, she says in her complaint and she has brought in here, that you cursed at her—called her this, that and the other thing on occasions—what about that?

"A. I wonder if she ever cursed me?

"Q. Just what did happen, Mr. Steiner, with regard to that?

"A. There was nothing but curses ever since we got married.

"Q. You mean—now, as far as the things you would say to her—these quarrels you would have— who would pick them? Did you pick the quarrels?

"A. Who is picking quarrels all over town?"

The above shows the evasiveness of defendant. He did not deny his "cursing" of plaintiff, although later in his testimony he denied calling plaintiff a "chippy."

Plaintiff's witness Hughes testified that he was a tenant of the plaintiff, and that he heard the parties quarreling on numerous occasions. He further testified that "Mr. Steiner was always the one who seemed to be the agitating person." He related that their quarrels were mostly over investments wherein the defendant wanted the plaintiff to invest in anything but government bonds. He further testified that defendant forced his way through the door of plaintiff's apartment about 5:30 one morning, knocking over a cupboard and breaking a lot of things. The witness further recalled defendant's unscrewing the light bulbs so that plaintiff could not turn on the switch.

Defendant admits that he prepared a deed for plaintiff to sign, conveying to him property in Baker. She refused to sign the same. He also admits that he requested her to make a will in his favor. This, she declined to do. She testified that he told her that he had found some people who could prove that she was not a "clean woman" (referring to her morals). She further testified that defendant told her on many occasions that she needed a guardian and was incompetent. This, defendant did not deny. In fact, he filed a petition to have a guardian appointed for her. His answer and cumulative evidence accentuated her need for a guardian. It appears from the transcript of testimony that counsel for defendant asserted that even before her marriage to defendant, plaintiff was incompetent and incapable of conducting her own affairs, but that she was competent enough to enter into a **marriage.**

Defendant's witnesses (and there were a number of them) testified about their relations with plaintiff regarding their various tenancies and made her out to be quite a frump. This evidence went mostly to the establishment of the incompetency of the plaintiff. However, it is urged that the quarrelsome attitude on her part is some evidence sustaining her quarrelsomeness with the defendant. No such inference should be indulged in.

As to defendant's allegations of cruelty on the part of the plaintiff, we will take them up in order. He charges her with "quarreling at, berating and abusing him." The evidence indicates that he was the instigator of the quarrels. He charges that she frequently locked him out of their apartment. The evidence indicates that this took place after she had filed her divorce suit. He charges that she rifled and damaged his personal effects. It must be remembered that he had her bonds in his suitcase, and she opened the same in an effort to locate her bonds. He charges that she did all in her power to harass and annoy him and make life miserable for him. This is merely a conclusion and not a statement of facts. He charges that she publicly, in the presence of others, accused him of trying to steal her money and various personal effects. The evidence shows, and he admits, that he took her government bonds and carried them away, thus precipitating the first divorce suit. He called no witness to sustain his answer, excepting the sheriff, who testified that the plaintiff complained to him about the loss of her bonds. The lower court heard and saw the witnesses and determined that plaintiff was not incompetent but was entitled to a divorce, and we agree with it. (In passing, it is interesting to note

that the husband himself was sent to the asylum before the case was concluded). The following is an excerpt from the opinion of the court:

"Now, the next question is the divorce. It is the opinion of the Court that the defendant in a few years gone by learned that Mrs. Weber had some money. He set out with a design to capture the money, and incidentally get her. He got her and tried to get the money. They drifted into trouble, quarrels and disputes over this very thing. Now, Mr. Steiner was so anxious about these matters that before the probate of Mrs. Steiner's former husband's estate, he had written to the Clerk of this Court inquiring as to who the beneficiaries were and how much money he had. Of course, he did that for his own personal welfare and his own personal information, and, after having received some information from the Clerk, he pursued the course of obtaining the widow in matrimony. * * * Now, Mr. Steiner has shown a well-planned disposition—a well-planned course—to get this old lady's money. Her span of life is not very long, and if he can hold on just a few more years, the ship will be his. Now, without going into a long, drawn-out dissertation, I am going to cut my remarks short.

"My opinion is that Mrs. Steiner has been a party to this whole affair, and she shouldn't be completely · exonerated in the financial world, I mean. I believe she is entitled to a divorce. I believe her evidence and I question Mr. Steiner to some extent on account of the motive involved, but in granting her a divorce, which I shall do, I think she should make contribution to Mr. Steiner, because she brought him here from California; his records show he was making around $1,500.00 to $2,000.00 a year."

■ Having found that the plaintiff is entitled to a divorce, this disposes of defendant's claim for separate maintenance.

■ As to the allowance of $6,000.00 by the court to the defendant as hereinabove indicated, the court did not specify how it arrived at this amount. The decree indicates that part is allowed as his interest in the community and part for equitable reasons. The opinion of the court, which is in the record, discloses that defendant left a job in California, which paid him the sum of $2,000.00 a year, to come to Baker to marry the plaintiff, and in equity, defendant should be compensated for the loss of his California earnings.

It is urged by defendant, and abundantly sustained by authority, that a court in a divorce suit has the authority to adjust the property rights between the parties, but we find no case cited, nor have we been able to find any in our investigation of the authorities, that goes so far as to authorize a divorce court to compensate the offending spouse for loss of earnings occasioned by a marriage. We hold that this is not the law in Oregon.

■■ Defendant further contends that plaintiff proposed the marriage and in consideration of which she agreed to turn over a large portion of her property to him. He sought to offer in evidence copies of letters written in German alleged to have been written by plaintiff, in which it is claimed she promised to give him the property as aforesaid. He contends that he had the original letters translated into English by a man in Seattle by the name of Geise, who was not called as a witness, and we are of the opinion that such copies were not admissible as evidence. In any event, such a promise, if made, could not be the basis for awarding him a money judgment in this case.

■ The decree infers that a portion of the $6,000.00 awarded represented defendant's interest in the com-

munity of the parties. Plaintiff contends that the Community Property Law, Ch. 525, Oregon Laws 1947, is unconstitutional in that the income of plaintiff from which the award was made was income from her property owned by her prior to their marriage. It will be unnecessary for us to pass on the constitutionality of said statute in view of the following: the record is not clear as to what the income of the plaintiff actually was during the period of the marriage; however, there is some evidence that her gross income was approximately $3,978.75, and that her total expenses were approximately $1,960.61, leaving her a net income of $2,018.84. The evidence shows that during their marriage plaintiff gave the defendant around $1,500.00, so that it appears he has received more than his one-half of the net income. Counsel for defendant frankly states in his brief that: "* * * there is no way from the record of ascertaining the exact amount or doing more than make an approximation." This court will not take from one party and give to another on approximations or speculations.

In view of the foregoing, the decree of the lower court will be modified to the extent that from such decree there will be eliminated the order awarding to defendant the sum of $6,000.00. In other respects, the decree will be affirmed.